CLIFTON J. BURWELL AND GINETTE A. BURWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burwell v. Commissioner
Docket No. 35669-84.
United States Tax Court
T.C. Memo 1988-495; 1988 Tax Ct. Memo LEXIS 523; 56 T.C.M. (CCH) 490; T.C.M. (RIA) 88495; October 13, 1988. Phillip K. Fife, for the petitioners. Irene Scott Carroll, David P. Fuller, and Harry Morton Asch, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in petitioners' *525 Federal income tax of $ 18,026.90 for the taxable year 1977. After a concession by the parties, the issues for decision are 1) whether loans made by petitioner to a corporation in which petitioner was a one-third shareholder were business debts or nonbusiness debts under section 166(d)[1] and 2) whether an investment tax credit claimed by petitioner on his 1976 tax return should be recaptured in 1976, the year the partnership which originally took the credit was transformed into a corporation, or in 1977, the year when the assets of the corporation were sold. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Clifton J. Burwell and Ginette A. Burwell are husband and wife and resided in Northridge, California at the time they filed their petition. Ginette A. Burwell is a party in this case solely because she filed a joint tax return with her husband *526 for the year in issue. All references to petitioner will be to Clifton J. Burwell unless otherwise indicated. The adjustments at issue involve petitioner and his relationships with the former entities known as Rain Brain Manufacturing Co. Rain Brain or the partnership) and Aqua Brain Manufacturing Co. (Aqua Brain or the corporation). Petitioner was a partner or shareholder in both these entities with two other individuals, Oded E. Sturman (Sturman) and Benjamin Grill (Grill). Petitioner is a plumbing contractor and has been one since the age of 17. He also now operates a sprinkler control manufacturing company. Petitioner met Sturman and Grill in 1971 when he rented them office space in the building where his plumbing business was and still is located. Through this association, petitioner became involved with them in a corporate venture called Negev Products to manufacture sprinkler values and toilets. Petitioner's ownership share in Negev was 25 percent. In 1975, petitioner, Sturman and Grill formed Rain Brain, which operated from May 1, 1975 to April 8, 1976, without a written partnership agreement. The partnership was formed to develop and manufacture automatic lawn *527 sprinkler control products. Petitioner owned a 25-percent interest and was allocated 90 percent of the profits, losses, deductions and credits of Rain Brain. [2] It was the partner's intention, however, that petitioner would be a straight 25-percent partner once the company became profitable. Petitioner did not receive any regular compensation from salary or other means from Rain Brain in either 1975 or 1976. Petitioner claimed an investment tax credit for section 38 property during the 1976 year in the amount of $ 1,105 which investment tax credit was allocated to them on Rain Brain's Form 1065 return for 1976. There is no dispute between the parties that Rain Brain did purchase section 38 property in 1976 which generated this investment tax credit allocable to petitioner. The partnership ceased operating as of April 8, 1976. On March 11, 1976, the three partners formed a new corporation called Aqua Brain. [3] On or about April 8 or 9, 1976, the assets, including the asset which *528 was the basis for the $ 1,105 investment tax credit claimed by petitioners on their 1976 Form 1040 return, were transferred from Rain Brain to Aqua Brain. The partners decided to incorporate because each of them expected Aqua Brain to generate very substantial gross profits upon commencement of its manufacturing operations. [4] The partners decided against electing subchapter S treatment to keep the anticipated profits from being automatically allocated to them as income. The partners also decided not to sell, transfer or assign to Aqua Brain their respective undivided interests in the patents for the inventions covering Aqua Brain's product line. Aqua Brain began functioning as a corporation on or about April 8, 1976, for the purpose of manufacturing and marketing automatic battery-powered *529 control systems for sprinkler heads. From its inception, petitioner, Sturman and Grill were equal shareholders of Aqua Brain and each of them received 33-1/3 percent of that corporation's stock of 333 shares for $ 333 per person. Each was elected a corporate director. Petitioner was designated chief executive officer and president of Aqua Brain from April 8, 1976 to July 14, 1977, although he received no regular compensation or salary from Aqua Brain in either 1976 or 1977. He did, however, reimburse himself for expenses incurred in his duties. Petitioner expected to receive the same salary as each of the other two shareholders once the corporation was profitable. Petitioner worked for a deferred salary because he believed Aqua Brain would ultimately be very profitable. He also welcomed the career change. Because petitioner had hired a general manager to perform various duties connected with his plumbing business even prior to his relationship with Aqua Brain, he was left even more time to devote to the Aqua Brain corporation. Petitioner's responsibility as president of Aqua Brain was basically to run the company, i.e., sign the checks, run the ads and get sales started. Petitioner *530 had one full-time sales person on staff and did get the product sold in a number of stores. Petitioner was not involved with the production of the product, which was left to Sturman and Grill. During 1976 and 1977, petitioner made a series of short-term, 90-day interest-bearing loans to Aqua Brain and received the corporation's promissory notes in exchange. No additional shares were issued when loans were made to the corporation. A list of the loans made to Aqua Brain from petitioner are as follows: Date
Due Date
Principal
Interest
of Note
of Note
Amount
Refund
Paid
4/12/76
7/12/76
$  69,111.96 Not repaid Not repaid
1/06/77
4/06/77
6,000.00 Not repaid Not repaid
1/31/77
5/01/77
6,600.00 Not repaid Not repaid
3/08/77
6/06/77
4,000.00 Not repaid Not repaid
3/15/77
6/15/77
750.00 Not repaid Not repaid
3/22/77
6/22/77
1,500.00 Not repaid Not repaid
3/24/77
6/24/77
15,700.00 Repaid in full Paid in full
3/31/77
6/30/77
7,000.00 Not repaid Not repaid
4/07/77
7/07/77
10,307.39 Not repaid Not repaid
Total principal
not repaid
$ 105,269.15
Petitioner expected *531 all of his loans to Aqua Brain to be repaid with interest at 10 percent. This was not to be. On or before July 14, 1977, petitioner, Sturman and Grill had a disagreement which resulted in Sturman and Grill calling a special meeting of the shareholders and the directors of Aqua Brain. Sturman and Grill voted to oust petitioner from his position as president and corporate officer of Aqua Brain and eliminate his power to sign checks on the corporation's bank account. Thereafter, Sturman and Grill managed Aqua Brain's operations. The corporation, however, had operated at a loss throughout its existence and ceased doing business in 1977, rendering the $ 105,269 of promissory noted held by petitioner worthless. Aqua Brain made no interest payments in 1976 or 1977 on any of the loans represented by the $ 105,269 of promissory notes. In August 1977, Barclay's Bank, which had loaned Aqua Brain substantial funds through a credit line, filed suit against Aqua Brain and the petitioner. Petitioner, Sturman and Grill each had guaranteed repayment of the bank loans by Aqua Brain via identical, separate continuing quaranties executed on June 7, 1976. The bank foreclosed its lien on certain *532 tangible assets of Aqua Brain in 1977. The tangible assets of Aqua Brain on which Barclay's Bank had foreclosed were sold at a public auction on or about October 31, 1977. One of the assets sold was the asset which was the basis of the investment tax credit claimed on petitioner's 1976 tax return. Petitioner was the high bidder at that public auction paying $ 68,000 for all of the tangible assets of Aqua Brain. Most of petitioner's income from 1977 as reported on their 1977 U.S. Individual Income Tax Return was received from their positions as employees of Burwell Plumbing Company. Throughout 1976 and 1977, petitioner continued to spend time on his plumbing business. Aqua Brain and petitioner's plumbing business were located in the same general facilities. OPINION The first issue for consideration is whether petitioner's debts constituted business or nonbusiness bad debts. Full deductibility from ordinary income is allowed for the worthlessness of business bad debts whereas worthless nonbusiness bad debts are accorded short-term capital loss treatment. Sections 166(a), 166(d). In order to qualify as a business bad debt the debt must have been created or acquired in connection *533 with a trade or business of the taxpayer, see section 166(d)(2)(A), or the loss must have been incurred in petitioner's trade or business. Section 166(d)(2)(B). [5] It is well established that being an employee may be a trade or business for purposes of section 166. See Putoma Corp. v. Commissioner,66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979). In order for petitioner to prevail, petitioner must establish first that he was in a trade or business and then that the loss resulting from the worthlessness of the debt bears a proximate relationship to the trade or business in which he was engaged at the time the debt became worthless. See section 1.166-5(b), Income Tax Regs. The test for determining whether a particular debt bears a proximate relationship to the taxpayer's trade or business was set forth by the Supreme Court in *534 United States v. Generes,405 U.S. 93, 103 (1972), as follows: In determining whether a bad debt has a "proximate" relation to the taxpayers's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient.
Thus, a taxpayer may establish the requisite "nexus" by proof that his dominant motivation in incurring the debt was to protect his employment. See United States v. Generes, supra;Shinefeld v. Commissioner,65 T.C. 1092 (1976). The determination of petitioner's dominant motive is essentially a factual inquiry, and the burden of proof is on petitioner. See Putoma Corp. v. Commissioner, supra at 673. Moreover, petitioner's testimony regarding his dominant motive for making the loans must be examined objectively in light of the overall record. Petitioner argues that the loans to Aqua Brain were made with the dominant purpose of protecting an employment from which he reasonably expected to be paid substantial compensation and were not made for the dominant purpose of either *535 earning interest income or for protecting an investment interest. Respondent counters that petitioner cannot rely on being an employee of Aqua Brain to establish that he was in a trade or business for the purposes of section 166 and that, even if the Court determines that petitioner entered into such a trade or business at some point, petitioner's employee status was not his dominant motive for making the loans to Aqua Brain. While he find that the record supports petitioner's contention that he was an employee of Aqua Brain, we nevertheless conclude that petitioner's dominant motive in making the loans was not to protect his employment. Petitioner did not receive any salary at all from Aqua Brain. Putting funds at risk under such circumstances is more characteristic of an investor. While there is no specific rule requiring that a taxpayer receive salary while he incurred the debts in order for it to be related to his trade or business, [6] it is still more the rule than the exception. As stated in Putoma Corp. v. Commissioner, supra at 674, "a loan motivated by one's status as an employee seems more plausible where it objective is to protect a present salary *536 rather than promote a future one." Petitioner's contentions that the loans were forwarded only under the belief that the corporation would immediately make profits and that he would be returned his deferred salary plus receive large future salaries, while plausible, is unconvincing in light of the other available facts. Petitioner had full employment as a plumbing contractor and received a salary from that business, totalling almost $ 80,000 in 1976. It is unlikely that an employee with job security elsewhere would have risked such a large sum of money to protect another job on the basis of promises of future rewards. Petitioner's behavior is more typical of an investor who has the desire to see his product on the market and was willing to risk the extra funds to see that dream fulfilled. See Shinefeld v. Commissioner, supra at 1099. Other indications of a lack of a dominant employment motive was that there was no written employment contract between Aqua Brain and petitioner, and all three shareholders would be earning equal *537 salaries once Aqua Brain became profitable. Petitioner argues nevertheless that it would be ludicrous to suggest that his dominant motive in making the loans was to protect a stock investment for which he paid $ 333 in cash. That being the case, the logical inference was that petitioner wanted to protect and preserve his position as its president, a position he anticipated would garner him very substantial ordinary income. We do not similarly interpret this set of circumstances. Petitioner and his two corporate partners originally capitalized the corporation with only $ 999, yet petitioner's testimony established that petitioner knew that a great deal more money was necessary to get the product off the ground. Petitioner testified that "if we could get together $ 50,000, we could take that product, take it -- get in into the marketplace * * *." In fact, petitioner invested almost $ 70,000 within the first 3 months of operation. Petitioner's dominant motive in making these loans was a desire to get the sprinkler system production off the ground and to ensure the continuing success of Aqua Brain as well as protect his investment in the patents. [7] As suggested in Putoma Corp. *538 , where a taxpayer consistently lends money to corporations in which he has an interest, this pattern appears more investment related than business related. Petitioner in the instant case had also loaned money to Rain Brain. Petitioner had been trying to produce this product for a number of years and knew that additional capital was necessary to finance the manufacture of the product. Moreover, that petitioner was not issued any more stock upon making his loans to Aqua Brain does not preclude an investment motive as the purchase of stock is not the only way to make an investment. *539 Petitioner continues, however, that his status as a minority shareholder precluded a meaningful investor position for him in Aqua Brain. His reward, rather, lay in the compensation his job as president of the company would provide. He made these loans under circumstances that a mere investor would never find acceptable. We find this argument unconvincing. Petitioner had been friendly with Sturman and Grill since 1971, and as petitioner's wife testified, "It wasn't only business between us. We had a friendship." He had invested with them in prior enterprises. He obviously trusted them. That Sturman and Grill ultimately turned on petitioner and stripped him of any power in Aqua Brain is merely hindsight. At the time petitioner entered into his investment with Sturman and Grill, each of the parties was a one-third equal shareholder, and each was promised an equal salary and fringe benefits, despite the position held. We find that petitioner's dominant motive in making the loans to Aqua Brain was not related to his status as an employee or proximately related to his trade or business. While petitioner desired a career change and worked hard as Aqua Brain's chief executive officer, *540 petitioner made the loans primarily to produce future profits through Aqua Brain and protect his investments in the patents. We must next consider the proper year that the investment tax credit claimed by petitioners on their 1976 tax return should be recaptured, which turns on when the section 38 property at issue ceased to be so with respect to petitioner. There is no dispute between the parties that Rain Brain did purchase section 38 property in 1976 which generated an investment tax credit allocable to petitioners in the amount previously stated and that petitioners are entitled to the $ 1,105 investment tax credit which was distributed to them in 1976 from Rain Brain. There is also no dispute concerning the transfer of the section 38 asset. It was stipulated that when Aqua Brain was formed, it took possession of an treated as its property all the tangible assets formerly held by Rain Brain including the assets which was the basis of the $ 1,105 investment tax credit claimed petitioners on their 1976 Form 1040. It was also stipulated that in August 1977, Barclay's Bank foreclosed on all the assets of Aqua Brain and in October 1977, the section 38 property was sold. The section *541 38 property was therefore disposed of at most slightly more than 18 months after it was originally acquired by the partnership, which is clearly less than the 5 to 7 years estimated useful life reported by the partnership and originally used in computing the claimed investment tax credit. Section 47(a)(1) requires the taxpayer to recapture investment credits taken pursuant to section 38 to the extent any of the underlying "property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38." Section 47(a)(1). Section 47(b) provides an exception to section 47(a)(1) when the property is disposed of by a mere change in the form in conducting the trade or business so long as the property is retained in such trade or business as section 38 property and the taxpayer retains a substantial interest in such trade or business. Section 1.47-3(f)(1)(ii), Income Tax Regs., sets forth the requirements for a disposition to qualify as a mere change in the form of conducting the trade or business as follows: (a) The section 38 property * * * is retained as *542 section 38 property in the same trade or business, (b) The transferor (or in a case where the transferor is a partnership, estate, trust, or electing small business corporation, the partner, beneficiary, or shareholder) of such section 38 property retains a substantial interest in such trade or business. (c) Substantially all the assets (whether or not section 38 property) necessary to operate such trade or business are transferred to the trasferee to whom such section 38 property is transferred, and (d) The basis of such section 38 property in the hands of the transferee is determined in whole or in part by reference to the basis of such section 38 property in the hands of the transferor. In this instance, petitioner and respondent agree that petitioners have satisfied subsections (a), (c) and (d) of section 1.47-3(f)(1)(ii), Income Tax Regs., and that the issue to be decided is whether petitioner retained a substantial interest. Section 1.47-3(f)(2), Income Tax Regs., defines substantial interest as follows: (2) Substantial interest. For purposes of this paragraph, a transferor (or in a case where the transferor is a partnership, estate, trust, or electing small business *543 corporation, the partner, beneficiary, or shareholder) shall be considered as having retained a substantial interest in the trade or business only if, after the change in form, his interest in such trade or business -- (i) Is substantial in relation to the total interest of all persons, or (ii) Is equal to or greater than his interest prior to the change in form. Thus, where a taxpayer owns a 5-percent interest in a partnership, and, after the incorporation of that partnership, and taxpayer retains at least a 5-percent interest in the corporation, the taxpayer will be considered as having retained a substantial interest in the trade or business as of the date of the change in form. Petitioner argues that he did not retain a substantial interest in Aqua Brain because under the Rain Brain partnership agreement, he was entitled to have allocated to him 90 percent of its profits, losses, credits and deductions. While he owned a theoretical 25-percent interest of any net capital which that partnership ever acquired, it never acquired any net capital. Thus, with the formation of Aqua Brain and the transfer to it of the assets of the partnership, he went from a position of being *544 entitled to 90 percent of any income Rain Brain might have made to a position of being entitled to 33-1/3 percent of any dividends Aqua Brain might ever declare on its common stock. Thus, there was a substantial decrease in his interest, and recapture is required in the year the partnership transferred the assets, or 1976. Respondent, on the other hand, contends that petitioner held a 25-percent interest in Rain Brain (notwithstanding a temporary 90-percent allocation of losses, profits, credits and deductions), and after the section 351 tax free organization held a 33-1/3 interest in Aqua Brain. This is a substantial interest not only in relation to the interests of the other shareholders, but it also equal to or greater than petitioner's interest prior to the change in the form of conducting business. We agree with respondent. We find that petitioner's 90-percent allocation of profits, losses, credits and deductions was in fact meant to be a temporary allocation. While testifying, petitioner himself reiterated this fact: Q. Well, what was your understanding about your partnership interest when you first formed it, before -- with Sturman and Grill? What percentage did you *545 think you owned? A. Well, -- Q. Of Rain Brain? A. I had 25 percent of Rain Brain. Q. And after the first year, when you saw that there were losses, it was agreed that you'd take 90 percent of the losses in the first year, and the credits, is that correct? A. Well, that was set up before that, but that was all discussed before that. Q. So -- A. Of profit and losses. Q. So, the intention had you remained in the partnership, was once the company became profitable, you would be a 25-percent partnership partner at that point, is that correct? Once all your loans to the partnership were repaid? A. That's right, once everything was backed down, yes.
This indicates that petitioner's percentage ownership interest in Rain Brain was 25 percent and that his ownership interest in Aqua Brain, being 33-1/3 percent, was equal to or greater than that of his interest in Rain Brain. We also agree with respondent that the section 351 tax free reorganization from a partnership to a corporate form was a mere change in form within the meaning of section 1.47-3(f), Income Tax Regs., and not a disposition of the partner's interest pursuant to section 1.47-69a), as contended *546 by petitioner. [8]In determining what constitutes a mere change of form, it was stated in Baker v. United States,398 F. Supp. 1143, 1151 (W.D. Texas 1975) that the controlling factors are "whether there is an unimpaired continuity of the essential business enterprise in a new form and whether the former owners of proprietory interest continue as such." The court in Baker also noted that a factual review was required to determine whether the same trade or business was conducted by the transferee as was conducted by the transferor. Moreover, in Ramm v. Commissioner,72 T.C. 671, 675 (1979), we note that the legislative history of section 47(b) indicates that Congress intended that the trade or business remain intact after the change in form. We have such a situation before us. Rain Brain ceased operating on April 8, 1976, the same date that Aqua Brain began functioning as a corporation. Aqua Brain took possession of and treated as its property all of the tangible *547 assets formerly held by Rain Brain, including the asset which was the basis of the investment tax credit claimed by petitioner. Thus, while technically the property may have passed from the partnership to the petitioners and back to the corporation all within a very short time, this is a technicality which does not change the substance of the transaction. The facts bear out that the corporate entity began on the same date that the partnership ceased operation and involved the same assets, the same individuals and the same product. The change in form was motivated purely for tax reasons, not to initiate a change in the type of business operated. The business itself remained intact. Additionally, the record is unclear as to what actually transpired during the section 351 reorganization. The partners each contributed cash for their stock in Aqua Brain, but the tangible assets were directly transferred to the corporation. That being the case, we can only conclude that the section 351 reorganization was a mere change in form and that petitioner retained a substantial interest in the trade or business in which the section 38 property was employed. The proper year for recapture is *548 therefore 1977. We finally address one additional argument set forth by petitioner. Petitioner contends that if one accepts respondent's proposition that the transition in 1976 from the Rain Brain partnership to the Aqua Brain corporation was no more than a mere change in the form of ownership of the underlying business, we must also determine that the sale in 1977 of these same assets to petitioner by auction was also a mere change in the form of ownership of the underlying business, which should preclude any recapture or further tax. This argument was raised for the first time on brief and is not entitled to consideration. In any event, petitioner's analysis is flawed. Petitioner cannot and has not established that each element of the four part test set forth in section 1.47-39f)(1)(ii), Income Tax Regs., is satisfied by petitioner's purchase of the property as the successful bidder at the foreclosure sale. First, petitioner has failed to fully demonstrate either that the transferor, Aqua Brain, retained a substantial interest in the property or that the property was used in the same trade or business. Further, section 1.47-3(f)(1)(ii) provides that the property's basis in *549 the hands of the transferee must be determined in whole or in part by reference to the basis of such property in the hands of the transferor, Aqua Brain. The evidence in this case suggests that petitioner's purchase of the property by bidding at an open auction sale requires a new basis calculation based on the amount paid by petitioner at the foreclosure sale. That being the case, we find that the exception to the recapture requirement for a mere change in form does not apply to a foreclosure sale. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioners had claimed losses with reference to the Rain Brain partnership of $ 34,373 in 1975 and of $ 34,193 in 1976 on their 1975 and 1976 U.S. Individual Income Tax Returns, respectively. ↩
3. The tax consequences of this change from the Rain Brain partnership to the Aqua Brain corporation using the section 351 tax free exchange provisions as they apply to petitioner's 1976 tax return were determined by this Court in Burwell v. Commissioner,T.C. Memo. 1985-583↩. 4. Sturman projected that within 5 years the company would have a gross profit of $ 2,500,000. ↩
5. Neither party contends that petitioner was in the trade or business of making loans for the purposes of section 166, as his lending activities were generally confined to corporations in which he had an interest. See Whipple v. Commissioner,373 U.S. 193↩ (1963). 6. See Pierce v. Commissioner,T.C. Memo. 1986-552; Goodenough v. Commissioner,T.C. Memo. 1980-28↩. 7. Petitioner's willingness to loan money to Aqua Brain in order to protect his interest is highlighted by his testimony concerning his desire to get the patents into the corporation when trouble between him and Sturman and Grill began. Petitioner testified: I even offered to pay them $ 40,000 to make sure that those patents were assigned exclusively into the corporation for [so] all the rights to producing that product would be in the corporation. * * * I got to be extremely concerned that * * * all this money was in this corporation and the corporation did not have the patents to produce the product." ↩
8. Section 1.47-6(a), Income Tax Regs.↩, sets forth the requirements of the investment tax credit recapture where there is a disposition of a partner's interest in the partnership.